**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

RENEE LOPEZ,

     Plaintiff,

v.                                        No. 1:16-cv-01112-JCH-KBM

DAVID J. SHULKIN, *in*
*his capacity as Secretary of the*
*Department of Veterans Affairs*,

     Defendant.

**MEMORANDUM OPINION AND ORDER**

On October 13, 2017, Defendant David J. Shulkin ("Defendant") filed a Motion for Summary Judgment and Supporting Memorandum (ECF No. 25). The Court, having considered the motion, briefs, evidence, argument, relevant law, and otherwise being fully advised, concludes that the motion for summary judgment should be granted as to both claims and the case dismissed.

## I.     FACTUAL BACKGROUND

The record, viewed in the light most favorable to Plaintiff Renee Lopez ("Plaintiff" or "Lopez") and drawing all inferences in her favor, shows the following.

**Lopez's employment and supervisory chain**

Lopez works as an Intermediate Care Technician at the New Mexico Veterans Affairs Healthcare System ("VA") in Albuquerque, New Mexico. Def.'s Mot. for Summ. J. ("MSJ"), Undisputed Fact ("UF") ¶ 1, ECF No. 25. Between 2013 and April 17, 2017, Lopez served as a Health Technician, GS-7, in the Surgical Service at the VA. *Id.* From August 2012 through March 2017, Nurse Manager Rebecca Chavez served as Lopez's immediate supervisor. *Id.*, UF ¶ 2. Between February 2, 2015, and January 12, 2016, James Russell, M.D., served as Lopez's second level supervisor. *Id.*, UF ¶ 3. James Goff, M.D., has been working in the VA as Chief of

Staff from mid-November 2016 to the present. *Id.*, UF ¶ 4. He previously worked in other capacities at the VA during the relevant time period: Chief of Surgery from February 2011 through January 2015, Acting Chief of Staff from February 2015 to mid-January 2016, and Chief of Surgery from mid-January 2016 to mid-November 2016. *Id.*

Dr. Paul Lesko ("Lesko") was employed as an Orthopedic Surgeon by the VA from 2012 until May 31, 2017. *Id.*, UF ¶ 5. The VA required Lopez, as a Technician, to follow directions by Physicians, like Dr. Lesko, in certain situations. *See* June 16, 2015 Letter of Reprimand, ECF No. 25-10 at 1 of 2; Lopez Dep. 54:10-13, ECF No. 25-13. Dr. Lesko, however, was not in her supervisory chain, he did not prepare her annual evaluations, and he did not set her schedule, or prepare or approve her work plans. *See* Lopez Dep. 54:14-55:1, ECF No. 25-13; Goff Decl. ¶ 7, ECF No. 25-2, and ¶¶ 8-9, ECF No. 29-1. Dr. Lesko did not have the authority to recommend disciplinary action against Lopez or otherwise affect her removal, reassignment, termination, or make any significant changes in her benefits. Lopez Dep. 55:7-56:10, ECF No. 25-13. Lopez admitted in her deposition that Dr. Lesko was not her supervisor. *Id.* 54:14-16.

### The VA's Sexual Harassment and Workplace Misconduct Policies

Between 2013 and 2016, the VA had in effect a Policy for the Prevention of Workplace Harassment ("the Policy"). Def.'s MSJ, UF ¶ 9, ECF No. 25. The Policy provided: "Persons believing they have been subject to workplace harassment to include sexual harassment should discuss concerns with their immediate supervisor, service line director, the EEO Program Manager, or an Office of Resolution Management EEO counselor." Goff Decl. ¶ 11, ECF No. 29-1. The Policy directed that formal complaints of workplace harassment may be brought to an EEO Counselor within 45 days of the date of the alleged acts. *Id.* ¶ 12. The VA required all employees to undergo annual training for the prevention of workplace harassment. *Id.* ¶ 13.

The VA also has a progressive discipline policy wherein penalties increase upon repeated occurrences as follows: (1) Written Counseling (not disciplinary); (2) Admonishment; (3) Reprimand; (4) Suspension; (5) Removal (non-probationary employees); and (6) Termination (probationary employees). *Id.* ¶ 23, ECF No. 25-2. The VA has a "zero tolerance" policy for "inappropriate behavior that demonstrates and/or suggests disruptive, threatening or volatile actions or communication toward staff." Dec. 21, 2015 Letter, ECF No. 25-6 at 2. VA policy also prohibits employees from making disrespectful remarks or behaving in a manner disruptive to the work environment. *Id.*

**The 2013 Incidents**

In February 2013, Lesko attempted to sit on Lopez's lap – conduct Lopez described as "unwelcomed" and "gross." *See* Lopez Dep. at 78:11-23, ECF No. 28-1, and 89:16-90:23, ECF No. 25-13. Lesko acknowledged that Lopez appeared uncomfortable when he tried to sit on her lap. Lesko Dep. 26:15-23, Doc. 28-2.

At another time in February 2013, on a "Jersey Friday" – so called because on Fridays staff was permitted to wear sports jerseys to work – Lesko walked up to Lopez, asked her what shirt she was wearing, and, without her permission, unzipped the hoodie covering her jersey. *See* Lopez Dep. 84:11-23, ECF No. 28-1, and 83:2-9, 88:1-90:8, ECF No. 25-13. The zipper was hitched about three inches below Lopez's neck. *Id.* at 84:24-85:4, ECF No. 28-1. As Lesko unfastened the zipper, the backside of his hand touched Lopez's breasts. *Id*. at 85:1-86:7. She did not appreciate him touching her at all. *Id.* 86:6-7. She walked away and zipped up the hoodie. *Id.* at 84:21-23.

Lopez did not report either Lesko's attempt to sit her lap or the hoodie incident to her supervisor, Ms. Chavez, until two years later, in March 2015, because of feelings of embarrassment. *See* Lopez Dep. 82:1-24, 89:14-20, ECF No. 25-13. No further unwanted contact

or interactions with Lesko occurred throughout 2013. *Id.* at 90:5-16. At the time of the 2013 incidents, Lopez did not think that she was working in a hostile work environment. *Id.* at 91:3-8. Lopez's feelings changed after Lesko gave her a poem when she began to feel uncomfortable and began to feel that she was working in a hostile work environment. *See id.* 27:2-18, ECF No. 28-1, and 91:1-15, ECF No. 25-13.

### 2014 poem incident and the VA's investigation of Lopez's complaint

In April 2014, Lesko presented Lopez with a poem, in which he expressed his feelings for her. Def.'s MSJ, UF ¶ 18, ECF No. 25; Poem, Doc. 25-4. When Lesko delivered it to her, Lopez read the poem in Lesko's presence, she threw it on the desk, and she walked out of the room. Lopez Dep. 93:10-14, ECF No. 25-13. Lopez appeared uncomfortable when he gave her the poem. Lesko Dep. 60:18-23, ECF No. 28-2.

After Lopez rejected Lesko's advances, he began treating her differently. *See* Lopez Dep. 93:1-4, ECF No. 25-13. On June 25, 2014, Lesko ignored her presence and efforts to help, and he walked around the clinic looking for another technician to assist him with an injection. Def.'s Ex. B, Attachment 1, ECF No. 25-3. Lopez felt disrespected and uncomfortable. *Id.* She reported the situation to her nurse manager and asked to go home. *Id.*

In July 2014, Lopez reported to Rebecca Chavez that she had received the poem from Lesko. Chavez Decl. ¶ 6, ECF No. 25-1. After reading the poem and feeling it was inappropriate, Ms. Chavez notified Lesko's supervisor, Dr. Kenneth Yaw, and then-Chief of Surgery Dr. James Goff. *Id.* Lopez, Ms. Chavez, Dr. Goff, and another nurse manager, Stacy Schneider, met to discuss Lopez's concerns about Lesko's behavior. Def.'s MSJ, UF ¶ 24, ECF No. 25. Lopez told Dr. Goff that Lesko's poem made her uncomfortable. Lopez Dep. 27:13-15, ECF No. 28-1. Ms. Chavez told Lopez to make a written complaint, and Dr. Goff told her that he would take care of it. *Id.* at 27:2-18.

On or about July 14, 2014, Lopez put the incident in writing by completing a Report of Contact ("ROC"). ROC, Doc. 25-3. In the ROC, Lopez described how during this last year, Lesko had "expressed a romantic interest beyond my professional relationship at work." *Id.* She stated that Lesko gave her a poem, and when she told him she was not interested in his advances, he made her feel uncomfortable. *Id.* She further reported that since she rebuffed his advances, he began treating her differently, and by way of example, recounted the incident on June 24, 2014, where he ignored her and looked for another person to help with an injection. *Id.* In this July 2014 ROC, Lopez did not report the 2013 incidents. *See id.* Nor did she make any mention of those 2013 incidents to her supervisors in the July 2014 meeting. Def.'s MSJ, UF ¶¶ 27-28, ECF No. 25; Lopez Dep. 69:5-22, 71:5-11, ECF No. 25-13. She asked Dr. Goff to address Lesko's conduct and she wanted Dr. Yaw to do something about the situation. Lopez Dep. 108:22-109:5, ECF No. 25-13.

Dr. Goff arranged for a fact-finding interview with Lesko, and on August 13, 2014, Dr. Goff interviewed Lesko about the allegations contained in Lopez's ROC to determine a course of disciplinary action, if any, and to hear Lesko's account of events. *See* Goff Decl. ¶¶ 16-17, ECF No. 25-2. After hearing Lesko's side of the story, Dr. Goff concluded Lesko's behavior was inappropriate and warned him not to engage in any similar behavior. *Id.* ¶ 17. In September, Dr. Goff prepared a written counseling letter to Lesko for violating the VA's policy concerning employee courtesy and conduct regarding his treatment of Lopez and for violating VA guidelines for animals in healthcare for an unrelated issue in which he brought a guinea pig into the facility. *See id.* ¶¶ 18-19; Def.'s Ex. B, Attachment 3, ECF No. 25-5. The written counseling letter is the first step in the disciplinary process against an employee under the VA's progressive discipline policy, although it is not itself considered a form of discipline, but may be cited when issuing an admonishment, reprimand, suspension, or removal. Goff Decl. ¶¶ 23-24, ECF No. 25-2. Dr. Goff

forwarded the letter to the VA's Human Resource Department for review and comments. *Id.* ¶ 18. On September 20, 2014, Dr. Goff informed Lesko he was issuing a Written Counseling to him and requested he make an appointment to receive the letter. *Id.* ¶ 19.

Dr. Goff did not give Lesko the letter of reprimand until December 4, 2014. *Id.* ¶ 22; Def.'s Ex. B, Attachment 3, ECF No. 25-5. The letter stated that Dr. Goff substantiated Lopez's complaint concerning Lesko's actions in singling her out and treating her differently and disrespectfully after she informed Lesko she was not interested in a romantic relationship with him. Def.'s Ex. B, Attachment 3, ECF No. 25-5. The letter instructed Lesko to refrain from any behavior that would be in violation of VA Policy, specifically the policy against unprofessional behavior with staff. *See id.* The letter further advised that it "may be used in determining an appropriate penalty if further infractions occur." *Id.*

### Subsequent incidents, complaints, and the VA's responses

On February 4, 2015, Lesko told Lopez in front of others to "room my patients now" in a demeaning, disrespectful, unprofessional manner. *See* Def.'s Ex. B, Attachment 5, ECF No. 25-7; Lopez Dep. 98:16-100:11, ECF No. 25-13. Lopez explained that the rooms were already filled. Def.'s Ex. B, Attachment 5, ECF No. 25-7; Lopez Dep. 99:3-5, ECF No. 28-1. A few minutes later, Lesko came back into the clinic and belittled Lopez in front of residents and providers by telling her in a rude manner to pick up a needle cap he had dropped on the floor. Def.'s Ex. B, Attachment 5, ECF No. 25-7; Lopez Dep. 99:15-22, ECF No. 28-1. On or about the same day, Lopez submitted another written ROC with Dr. Goff, explaining this February 4, 2015 incident. Def.'s Ex. B, Attachment 5, Doc. 25-7.

Dr. Goff met with Lopez, Ms. Schneider, and Ms. Chavez to review the ROC on February 6, 2015. Def.'s MSJ, UF ¶ 38, ECF No. 25. Dr. Goff subsequently met with Lesko and

others on February 20, 2015. *Id.*, UF ¶ 39. Lesko disputed Lopez's version of events, saying that he did not belittle her. *See* Goff Decl. ¶ 27, ECF No. 29-1.

On March 20, 2015, Lopez was in a corridor assisting a patient in a wheelchair and bent over to talk to the patient. Lopez Dep. 100:21-102:12, ECF No. 25-13. Instead of going in front of them, Lesko walked behind Lopez in a space of around 15 inches and brushed against her buttocks. *See id.* at 101:7-102:12. Lesko did not hesitate as he walked by her, and the contact lasted as long as it took for him to walk by, a couple of seconds. *See id.* 103:9-25. Because he had more room to go in front of her than behind, she believed he did it purposely to get her angry and she inferred that he wanted to show her he could do whatever he wanted as a doctor. *See id.* at 104:11-105:6. Lopez reported this incident to Ms. Chavez the same day. *See* Chavez Decl. ¶ 12, ECF No. 25-1.

On March 29, 2015, Dr. Goff sent a Memorandum to the Chief of Human Resources regarding Lopez's February 4, 2015 ROC, explaining his finding that Lesko treated Lopez in a demeaning manner, despite having received a prior written counseling. Def.'s Ex. B, Attachment 6, ECF No. 25-8 at 1-2. Dr. Goff wrote in a fact finding, "Ms. Lopez feels that Dr. Lesko's persistent negative behavior toward her constitutes promotion of a hostile work environment by him and despite previous written counseling, the negative behavior has returned." *Id.* at 6 of 6. Dr. Goff concluded that Lesko had failed to follow the prior written counseling and failed to follow VA Policy 05-48, Employee Courtesy and Conduct, and recommended that Lesko be suspended for three days. *See id.* at 4 of 6; Goff Decl. ¶ 28, ECF No. 29-1.

Lopez and a coworker were discussing an important matter concerning a patient on March 31, 2015, when Lesko walked directly between the two, interrupted their conversation, and told Lopez to "get to work." Lopez Dep. 106:2-107:25, ECF No. 25-13. Lopez walked away, but it made her feel singled out by Lesko. *Id.* at 106:18-107:25.

Andrew Welch, Director of the VA, placed Lesko on an "Authorized Absence" on April 1, 2015, pending the outcome of an investigation. April 1, 2015 Letter, ECF No. 25-9. Mr. Welch wrote in his letter to Lesko that "[b]ased on facts that have come to my attention, concerns for your safety, and the safety of other [VA] employees," Lesko was immediately "placed in a paid non-duty status of authorized absence" and he was not to enter VA grounds. *Id.* Lesko was paid during his administrative leave and he did not lose any money or benefits. Lesko Dep. 50:7-15, ECF No. 28-2.

On April 2, 2015, Lopez reported to Ms. Chavez the March 31, 2015 incident in which Lesko rudely walked between her and a co-worker. Chavez Decl. ¶ 13, ECF No. 25-1. On April 9, 2015, Dr. Goff appointed Charles Nelsen to investigate the March 31, 2015 incident. Def.'s MSJ, UF ¶ 44, ECF No. 25. On May 5, 2015, Dr. Russell issued a letter to Lesko proposing to reprimand him for his behavior on March 31, 2015. *Id.*, UF ¶ 46. The investigation culminated in a June 16, 2015 letter of reprimand issued by Mr. Welch to Lesko. June 16, 2015 Letter, ECF No. 25-10. In his letter, Mr. Welch wrote that the investigation into Lesko concerned his

> interactions with co-workers who are subordinate to you as you are a Physician and they are Technicians who are required to follow your direction in certain situations. Evidence establishes that you have initiated inappropriate and unprofessional workplace relationships with junior members of the Surgical Service staff. You have crossed the line of generally accepted standards of conduct in any work place where there exists a senior-subordinate relationship. Your actions showed poor judgment and have created a hostile work environment.
>
> Your actions constitute creating a hostile work environment for coworkers….

*Id.* at 1. He concluded that Lesko's actions violated Memorandum 05-48, Employee Courtesy and Conduct. *Id.* Mr. Welch noted that his decision took into account that this was Lesko's second offense based on his December 2014 counseling for unprofessional behavior. *Id.* at 2. The letter informed Lesko that the copy of the reprimand would be placed in his official personnel folder for three years, or it may be withdrawn and destroyed after two years depending

entirely on his future behavior and attitude, and that during this time, it may be used in determining an appropriate penalty for any further infractions. *Id.*

On June 22, 2015, Lesko returned to work at the VA and was assigned to Unit 2D, ENT. Def.'s MSJ, UF ¶ 48; Lopez Dep. 117:2-7, ECF No. 25-13. That same day, Lopez attended mediation through EEO during which the VA offered to move Lopez to a different work area, but Lopez refused because she felt it was unfair for her to move. Compl. of Employment Discrimination ("Emp. Compl."), ECF No. 28-2 at 12 of 21.

The next day, Dr. Russell issued a Memorandum to Lesko setting forth his return to work requirements, wherein he instructed Lesko that he was not to have any communication or contact with Lopez and he was not to enter the 2B surgical clinic area. Russell Decl. ¶ 14, Doc. 25-14. Despite this admonition, on June 23, 2015, Lesko appeared in the surgical clinic, even though he had no scheduled patients to see. *See* Pl.'s Ex. F, ECF No. 28-2 at 14-15 of 21. On August 3, 2015, Lesko again came to the clinic where Lopez had been assigned, but he had no interaction with her. *See* Pl.'s Ex. H, ECF No. 28-2 at 17 of 21. Lesko also came into the 2B clinic on September 3, 2015, so Ms. Schneider sent Lopez off the floor while he was there. Pl.'s Ex. G, ECF No. 28-2 at 16 of 21. Dr. Yaw informed Ms. Schneider that Lesko was seeking care as a patient and received an injection, but Ms. Schneider noted that the appointment in the system was made after the appointment occurred. *Id.*

The VA temporarily moved Lopez from her rotation with orthopedic clinic starting from July 2015, which Lopez perceived as unfair and made her feel isolated from her normal cohort of coworkers. *See* Emp. Compl., ECF No. 28-2 at 10 of 21. In late September, Lopez emailed Donald Rincon, telling him that she was informed that Lesko would return to the 2B surgical clinic on October 5, 2015. Pl.'s Ex. E, Doc. 28-2 at 13 of 21. She wrote that she felt concerned

for her safety, and she did not feel it was appropriate for them to work together in the same clinic. *Id*.

In October 2015, the VA permitted Lesko to return working in Unit 2B. Russell Decl. ¶ 16, ECF No. 25-14. When Lesko was working in Unit 2B, Ms. Chavez, "floated" Lopez to work in other areas of the hospital to try to avoid Lopez having contact with Lesko. *See* Chavez Decl. ¶ 18, ECF No. 25-1. During times when Lopez needed to be in Unit 2B, Ms. Chavez took steps so that Lopez did not have to work with Lesko. *Id.* On December 18, 2015, Dr. Yaw admonished Lesko in an email that he was only permitted to be in 2B when he had scheduled patients; otherwise, he was instructed to not go into the work area on the other side of the waiting room. Pl.'s Ex. I, ECF No. 28-2 at 18 of 21. In the email Dr. Yaw wrote, "We have discussed this many times, and this email intentionally creates a record of your instructions." *Id.*

Normally when the VA is dealing with a complaint, the VA moves the person about whom the complaint is against to another work location while leaving the complainant where he or she is. *See* Welch Dep. 8:16-21, ECF No. 28-2. However, in this case Mr. Welch decided to do the opposite because of Lesko's role "for us as a physician" and the need for him to have his equipment close to him. *See id.* 8:22-9:6. Lopez preferred to stay in Unit 2B, but because Lesko was coming back, she did not want to feel uncomfortable, so Lopez requested a move to a different area. *See* Lopez Dep. 32:21-36:13, ECF No. 25-13. Mr. Welch promised Lopez that he would find her another position. Lopez Dep. 120:7-10, ECF No. 28-1. He offered to hire Lopez as a nursing assistant, but Lopez did not accept that offer because her earnings would be reduced and she would have to work holidays and weekends. *Id.* 120:15-19. Because the VA was moving Lesko back to the clinic, Lopez agreed to go to optometry, and for a short period, the VA moved her to the optometry clinic and trained her for a position there. *See* Lopez Dep. 33:1-35:8, ECF No. 25-13, and 120:25-121:6, ECF No. 28-1. The VA subsequently removed her from that

position, saying she was not qualified for it, returning her to Unit 2B. *See id.* 34:25-36:21, ECF No. 25-13, and 121:3-6, ECF No. 28-1.

**Employment discrimination complaint and subsequent incident**

On July 6, 2015, Lopez filed a Complaint of Employment Discrimination ("Complaint") with the VA's Office of Resolution Management. Pl.'s Ex. D, ECF No. 28-2 at 9 of 21. In her Complaint, Lopez stated, among other things, that Lesko had retaliated against her for turning down his advances. *Id.* at 10 of 21. She asserted that she was removed from rotation in the orthopedic clinic starting on July 15, 2015, which she felt was unfair since he was unprofessional and she was being singled out and isolated. *Id.* She reported the poem incident, and the February 2, March 20, and March 31, 2015 incidents. *See id.* at 10-11 of 21.

On January 26, 2016, Lopez sent Dr. Goff another ROC after Lesko saw Lopez in the hallway and made physical contact with her by bumping her shoulder when passing her. Goff Decl. ¶ 36, ECF No. 25-2. Dr. Goff conducted a fact-finding interview and recommended a five calendar day suspension for the physical contact with Lopez and other unrelated infractions. *Id.* ¶ 37. On May 31, 2016, Mr. Welch issued a five-calendar day suspension to Lesko for a number of infractions, including for the January 26, 2016 incident. Def.'s Ex. B, Attachment 10, ECF No. 25-12 at 1. The letter of suspension explained to Lesko that he engaged in "[u]nwanted physical contact with [a] subordinate female employee" and noted that the issue was of particular concern because he had "previously received a reprimand for this behavior." *Id.* Mr. Welch found his actions were "highly inappropriate, disrespectful behavior, and adversely impact the efficiency of the" VA, and his actions violated Memorandum 05-48, Employee Courtesy and Conduct. *Id.*

Following an investigation of Plaintiff's Complaint, the Office of Resolution Management issued its Final Agency Decision on August 31, 2016. Def.'s MSJ, UF ¶¶ 56-57, ECF No. 25. Plaintiff filed suit on October 6, 2016, alleging discrimination on the basis of sex in

violation of 42 U.S.C. § 2000(e) (Count I) and retaliation that consisted of moving Plaintiff to different clinics, ostracizing her after making a complaint of harassment, and subjecting her to a hostile work environment (Count II). Defendant has moved for summary judgment on both claims.

## II.    STANDARD

On a motion for summary judgment, the moving party initially bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (internal quotations omitted). Only disputes of facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *See id.* at 248.

## III.    ANALYSIS

### A.  Hostile Work Environment Claim

Count I of Lopez's Complaint asserts a Title VII claim for sex discrimination on the basis of a sexually hostile work environment. "Title VII … makes it 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.'" *Bird v.*

*West Valley City*, 832 F.3d 1188, 1205 (10th Cir. 2016) (quoting 42 U.S.C. § 2000e–2(a)(1)). This language encompasses protecting individuals from working in a discriminatorily hostile work environment. *Id.*

For a plaintiff to prevail on a Title VII gender-based hostile work environment claim, she must show that she was discriminated against because of her gender and "that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)). A plaintiff must show that the work environment was both objectively and subjectively hostile and abusive. *Id.* at 664. A court examines the objective severity of the harassment from the perspective of a reasonable person in the employee's position, considering the totality of the circumstances. *Id.*

Even if an employee shows a sexually hostile work environment existed, the employee must also satisfy a basis for holding her employer liable under Title VII. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007). "An employer may be directly or vicariously liable for a hostile workplace." *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 650 (10th Cir. 2013). An employer's liability depends on the status of the harasser – whether the harasser is a co-worker or supervisor. *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). As the Supreme Court explained:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Id.*

Defendant argues that Plaintiff cannot establish an objectively hostile work environment because Lesko's conduct towards her was insufficiently severe or pervasive. The Court need not consider that issue because, for the reasons discussed *infra*, no reasonable jury that considers the evidence could find in favor of Plaintiff that Defendant is liable for any such harassment. *Cf. Benavides v. City of Oklahoma City*, 508 F. App'x 720, 724 (10th Cir. Jan. 23, 2013) (unpublished) (concluding there was no genuine fact issue as to whether city took prompt remedial action where it undertook investigation and imposed discipline in response to plaintiff's allegations of harassment, and thus, declining to address whether plaintiff was subjected to conduct that was sufficiently severe or pervasive to constitute hostile work environment).

### 1.   Lesko was not Plaintiff's supervisor

Where the harassment does not culminate in a tangible employment action, an employer may be held vicariously liable for a hostile work environment "created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). In *Vance*, the Supreme Court held "that an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 570 U.S. at 431 (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The Supreme Court rejected "the nebulous definition" that defined a supervisor based on the ability to exercise significant direction over another's daily work. *See id.* at 431.

Defendant argues that Lesko was not Plaintiff's supervisor because the VA gave him no authority to take any tangible employment actions against Plaintiff. Plaintiff, in response, argues that Director Welch called Lopez a "subordinate" because Lesko was a Physician and Lopez was a Technician who was required to follow his direction in certain situations. Plaintiff also notes that Lesko had the ability to exclude Plaintiff from his working area. As an initial matter, the Court does not agree with Plaintiff that Defendant admitted that Plaintiff was Lesko's subordinate when issuing him a letter of reprimand. The letter noted the allegations he was facing regarding his "interactions with co-workers who are subordinate to you as you are a Physician and they are Technicians who are required to follow your direction in certain situations." Def.'s Ex. B, Attachment 8, ECF No. 25-10 at 1. This statement does not amount to an admission that Lesko was a supervisor within the meaning of Title VII.

Turning to the meaning of supervisor in the context of Title VII, the Supreme Court in *Vance* specifically rejected the definition of supervisor upon which Plaintiff relies that considers the ability to exercise significant direction over a plaintiff's daily work. It is undisputed here that Lesko had no authority over Plaintiff to hire, fire, fail to promote, reassign, or cause her a significant change in benefits. As a matter of law, Lesko was not Plaintiff's supervisor within the meaning of Title VII. *Cf. Vance*, 570 U.S. at 426, 450 (affirming summary judgment in favor of employer where there was no evidence that harasser was plaintiff's supervisor because she could not hire, fire, demote, promote, transfer, or discipline plaintiff, and plaintiff failed to prove employer was negligent). Consequently, Plaintiff can only succeed on her sex discrimination claim against Defendant under Title VII on a negligence theory. *See id.* at 445 (stating that in cases in which the harasser is a co-worker, "the victims will be able to prevail simply by showing that the employer was negligent in permitting this harassment to occur").

2. **There is no genuine fact issue as to whether Defendant took prompt and appropriate remedial action in response to Plaintiff's allegations of harassment**

To establish that an employer is directly liable for a hostile work environment, the plaintiff must present enough evidence "for a reasonable jury to find that the employer knew or should have known about the harassment but failed to stop it," in other words "that the employer was negligent in failing to stop harassment." *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 650 (10th Cir. 2013). The plaintiff bears the burden of establishing that the employer's conduct was unreasonable. *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001). According to the Tenth Circuit, "the most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Debord*, 737 F.3d at 654 (quotations omitted). "[C]orrective action does not always require discipline." *Id.* "An employer is absolved of liability for acts of harassment by its employees if it undertakes remedial and preventative action 'reasonably calculated to end the harassment.'" *Duncan v. Manager, Dep't of Safety, City and County of Denver*, 397 F.3d 1300, 1310 (10th Cir.2005) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)).

There is no bright-line rule for measuring the adequacy of an employer's response; the question is whether the employer's response was reasonable under the circumstances. *See Adler*, 144 F.3d at 675-76. "It is not always possible for an employer to completely eliminate offensive behavior, and thus the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the 'remedial and preventative action was reasonably calculated to end the harassment.'" *Turnbull v. Topeka State Hospital*, 255 F.3d at 1245 (quoting *Adler*, 144 F.3d at 676). In cases where effectiveness is not readily evidenced by a stoppage, courts "consider the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the

response was proportional to the seriousness and frequency of the harassment." *Adler*, 144 F.3d at 676.

Defendant asserts that it took all reasonable steps as a matter of law and is entitled to summary judgment. Plaintiff argues, however, that "Defendant continuously allowed Dr. Lesko to harass Plaintiff after she complained she was being subjected to a hostile work environment." Pl.'s Resp. 22, ECF No. 28. The record, however, does not support Plaintiff's assertion; rather, it shows repeated reasonable, progressive responses by Defendant aimed to stop Lesko's conduct toward Lopez.

Plaintiff admitted in her deposition that she did not subjectively believe the hoodie and lap sitting incidents at the time they occurred as amounting to a hostile work environment, and she did not report the incidents for approximately two years. Consequently, Plaintiff's first complaint about Lesko involving possible sexual harassment occurred in July 2014, when she reported the poem incident to Rebecca Chavez. Plaintiff contends that the written counseling letter for Lesko that resulted from Defendant's investigation was essentially meaningless because it did not separate Lesko from Lopez, did not stop him from harassing her, and Dr. Goff did not issue it until nearly five months after Lopez reported Lesko, during which time Lopez was required to continue working around Lesko. Lopez, however, presented no record evidence that any further unwanted behavior from Lesko occurred in the remainder of 2014 during the time period in which Dr. Goff investigated Lopez's complaint and issued his findings. At the time Defendant issued the written counseling letter, Plaintiff had not notified a supervisor of the prior 2013 incidents involving the hoodie and lap sitting. Dr. Goff had already informed Lesko on September 20, 2014, that he was going to issue him a Written Counseling, which he followed through with in December 2014. Dr. Goff substantiated Lopez's complaint in his letter to Lesko, instructed him to refrain from any unprofessional behavior with staff, and expressly warned that

the letter "may be used in determining an appropriate penalty if further infractions occur." Def.'s Ex. B, Attachment 3, ECF No. 25-5. The Court concludes based on the record that the response of the City was prompt, adequate, and proportional for the first reported incident, and was reasonably calculated to end the harassment. *Cf. Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1259-60 (10th Cir. 2003) (concluding that defendant's response to accusation of harassment in investigating, counseling on harassment policy, and warning that company would not tolerate harassment was prompt and adequate as a matter of law).

Plaintiff's next formal complaint concerning Lesko's behavior occurred after the issuance of the written counseling letter, concerning the February 4, 2015 incident when he demanded she room his patients and pick up a cap off the floor. Dr. Goff began a prompt investigation of the incident on February 6, 2015, and during the time period in which he was processing the complaint, Lopez informed her supervisors of the March 20, 2015 incident in which Lesko brushed against her buttock as he passed her in a corridor while she was bent over assisting a patient in a wheelchair. During this timeframe in March 2015, Lopez also for the first time told her supervisors about the hoodie and lap incidents from 2013. On March 29, 2015, Dr. Goff found that Lesko behaved inappropriately with Lopez despite the prior warning, and proposed progressive discipline in the form of a three-day suspension. On April 1, 2015, Director Andrew Welch placed Lesko on an "Authorized Absence" pending the outcome of an investigation that lasted nearly three months. The VA's action was a form of progressive discipline reasonably designed to end the harassment.

On April 2, 2015, Lopez informed her supervisor about the March 31, 2015 incident in which Lesko walked between her and a co-worker and rudely interrupted their conversation about a patient. Defendant again took Plaintiff's allegations seriously – on April 9, 2015, Dr. Goff appointed an investigator for the March 31, 2015 incident, and the investigation culminated

in a June 16, 2015 letter of reprimand that went into Lesko's personnel file. Lesko did not return to work until June 22, 2015, and he was assigned to ENT, a different unit from Lopez, and instructed not to communicate with her or to enter the 2B surgical unit where she worked.

Plaintiff argues that the discipline was not reasonable, suggesting that Defendant should not have permitted Lesko to return to work on June 22, 2015. As the Tenth Circuit has repeatedly noted, if the law required employers to impose excessive discipline, employers would face due claims of violation of due process rights and wrongful termination from the purported harasser. *See Scarberry*, 328 F.3d at 1262 (quoting *Adler*, 144 F.3d at 677). Defendant forbade Lesko from returning to work for nearly three months. Based on the record, it was reasonable for Defendant to permit Lesko to return to work after a nearly three-month forced absence and under conditions limiting his contact with Lopez.

Plaintiff additionally asserts that Defendant's response was unreasonable because the harassing behavior did not end, and in support points to the undisputed facts that Lesko came into Unit 2B on June 23, 2015, August 3, 2015, and September 3, 2015, without prior scheduling. Although Lesko may have violated the directive by his supervisors not to enter the unit without a prior scheduled appointment, he did not interact with Lopez during those three visits to the clinic in that three-month period. This evidence does not create a factual question concerning the reasonableness of allowing Lesko to return to work under restrictive conditions.

Plaintiff also contends it was not reasonable for Defendant to allow Lesko back into the same clinic as Plaintiff in October 2015 because the VA already found Lesko had violated hospital policies and created a hostile working environment for her. The VA ordinarily attempts to move the person against whom the complaints are made, not the complainant. The Court acknowledges that in "certain circumstances, an employer's failure to remove a supervisor from close working proximity with a subordinate who has alleged sexual harassment against that

supervisor might be seen as unreasonable." *Pinkerton v. Colorado Dept. of Transp*., 563 F.3d 1052, 1062 (10th Cir. 2009). A number of factors, however, compel the Court to conclude that no reasonable factfinder could see Defendant's actions as unreasonable in this case. *Cf. id.* (holding that employer did not act unreasonably by failing to remove harasser from his supervisory position over plaintiff upon her first complaint where harassment was in form of oral statements that ceased after complaint, plaintiff did not request separation, employer promptly launched investigation, and matter was resolved in weeks).

First, Lesko did not have supervisory authority over Lopez. Second, Defendant imposed a leave of absence on Lesko for nearly three months. Upon his return, he was restricted to the ENT unit and told to have no communication or contact with Plaintiff. During his time in the ENT unit, Lesko did not have any interactions with Lopez. Defendant then moved Lesko from ENT back into the 2D surgical unit because of his position as an orthopedic surgeon and his need for specialized equipment located there. Defendant nevertheless took numerous steps to prevent Lesko from interacting with Lopez in Unit 2B: Ms. Chavez "floated" her to other areas of the hospital when Lesko was working in the clinic; during times when Lopez needed to be in Unit 2B, Ms. Chavez took steps so that Lopez did not have to work with Lesko; and on December 18, 2015, Lesko's supervisor, Dr. Yaw, admonished him that he was only permitted to be in 2B when he had scheduled patients; otherwise, he was instructed to not go into the work area on the other side of the waiting room. Although Lopez said working in the same unit as Lesko made her uncomfortable, Lopez made no other complaints to her supervisors concerning specific interactions with Lesko through the remainder of 2015. Moreover, Dr. Goff and Mr. Welch tried to work with Plaintiff to accommodate her request for a transfer to another section of the hospital, but she declined Mr. Welch's offer to hire her as a nursing assistant. Lopez agreed to go

to the optometry clinic, and for a short period, the VA moved her and trained her for a position there, although it subsequently removed her from that position for lack of qualifications.

Tenth Circuit guidance demonstrates that victims may have to be in contact with their harasser while the employer imposes reasonable, progressive discipline:

> The employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective. Repeat conduct may show the unreasonableness of prior responses. On the other hand, an employer is not liable, although a perpetrator persists, so long as each response was reasonable. It follows that an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to [] end the harassment. *See Hirschfeld [v. New Mexico Corrections Dep't]*, 916 F.2d [572,] 579 n. 6. (10th Cir. 1990)] ("While there may be egregious cases where such action is the only option for an employer, in less serious cases a reprimand, brief suspension, or other remedial steps may be sufficient to remedy the situation.")....

> Unfortunately, some harassers may simply never change. *Just as unfortunate, a victim may have to suffer repeated harassment while an employer progressively disciplines the perpetrator to determine whether he or she is just such a "hard head" case. It is some consolation for the victim that, to be reasonable, responses must progress more rapidly in proportion to more serious and frequent harassment.* The courts, however, must balance the victim's rights, the employer's rights, and the alleged harasser's rights. If our rule were to call for excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination.

*Adler*, 144 F.3d at 676-77 (italics emphasis added).

Finally, Plaintiff asserts that the January 26, 2016 incident in which Lesko bumped her shows the unreasonableness of Defendant's prior remedial measures. The Court disagrees. There is nothing in the record suggesting that the bump was sexual in nature or of such a degree to cause any physical harm. Moreover, as with Plaintiff's other complaints, Defendant promptly investigated the incident and imposed progressive discipline – Lesko was suspended for five calendar days for a number of infractions, including the bump.

Plaintiff's complaints of harassment were not so egregious to require permanent removal of Lesko from the 2B surgical unit or termination. Defendant imposed progressive disciplinary actions following each investigation of a formal complaint made by Plaintiff. Defendant also took a number of steps to reduce the chance that Lopez would work with or near Lesko. Plaintiff has not produced evidence from which a jury could reasonably conclude that Defendant's responses to her complaints of harassment were inadequate or not reasonably calculated to end the harassment, and therefore, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim. *Cf. Benavides*, 508 F. App'x at 724 (affirming summary judgment because plaintiff failed to carry burden of demonstrating city's response to harassment was inadequate where supervisor instructed co-workers to cease, initiated extensive investigation of incident, and imposed discipline); *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (affirming grant of summary judgment on hostile work environment claim because employer took reasonable corrective action on plaintiff's complaints where employer ordered co-worker to remove offensive poster and, after subsequent complaint about coarse email, issued co-worker written warning); *Rennard v. Woodworker's Supply, Inc.*, 101 F. App'x 296, 305-06 (10th Cir. June 9, 2004) (unpublished) (affirming summary judgment for employer on sexual harassment claim because no rational jury could find that employer's investigation and remedial measure were inadequate); *Hollins*, 238 F.3d at 1259 ("In each of the above incidents, when Delta was presented with a potentially harassing situation, it immediately investigated, took corrective action, and disciplined any offending employees. Delta conducted itself as a reasonable employer."). *See also Scarberry*, 328 F.3d at 1257 (noting that "the court may simply examine the record, including the undisputed evidence, to determine whether [an employer's] responses to claims of sexual harassment were reasonable as a matter of law").

## B. Retaliation

To succeed on a retaliation claim, the plaintiff must prove by a preponderance of evidence that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between these two events. *See Duncan v. Manager, Dept. of Safety, City and County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir. 1998). An adverse action in a retaliation claim is one in which "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). Once a plaintiff makes a prima face showing, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001). If defendant does so, the plaintiff must respond by demonstrating that the defendant's asserted reasons for the adverse action are pretext. *Id.*

Defendant contends he is entitled to summary judgment because Plaintiff cannot show that she suffered any adverse action. Plaintiff asserts she suffered an adverse action when she was forced to move to the optometry clinic after Lesko returned to Unit 2B in October 2015. She argues the record shows that the VA pushed her to transfer by asking her to transfer in June 2015, and when she refused, returning Lesko to Unit 2B even though the VA knew she would be uncomfortable. Lopez, however, admitted in her deposition that her move to optometry was because of her own request that the VA find her another position away from Lesko, which the VA initially allowed. She acknowledged that Ms. Chavez moved her to optometry to protect her when Lesko returned to Unit 2B. Lopez Dep. 35:5-6, 36:7-13, ECF No. 25-13. The transfer to optometry was only temporary and nothing in the record indicates a loss of duties, privileges, or

benefits during the transfer. The record does not support Plaintiff's position that she was transferred to optometry in retaliation for her complaint of harassment.

Nor would a reasonable jury be able to find from this record that the VA's actions would dissuade a reasonable worker from making or supporting a charge of discrimination. Each time Plaintiff made a complaint, the VA substantiated Plaintiff's claim and imposed a form of discipline progressively more harsh against Lesko. The VA permitted Lesko to return to work after a nearly three-month forced leave of absence, and when he returned he was placed under restrictive work conditions in a separate unit away from Lopez. Although he entered Unit 2B a few times during that approximately three-month period from the end of July through October, he engaged in no negative interactions with Lopez during that timeframe. A reasonable jury simply could not construe the VA permitting him to return to work in the same unit as Plaintiff, under conditions and with efforts made to avoid contact between them, as an adverse action that would dissuade a reasonable worker from complaining of harassment. As discussed *supra*, unless it is an egregious circumstance not present here, Tenth Circuit law does not require an employer to permanently separate a harasser from the complainant while the employer follows progressive discipline. Consequently, allowing Lesko to return to work in the surgical unit where his equipment was located was not an adverse action in itself, nor was moving Lopez temporarily to optometry based on her own request for a transfer.

Plaintiff additionally asserts she was subject to an adverse action by forcing her to work in a hostile environment following her complaints. "Coworker hostility or retaliatory harassment may be an 'adverse employment action' if it is sufficiently severe." *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1269 (10th Cir. 2005) (citing *Gunnell*, 152 F.3d at 1264). A hostile work environment claim, however, requires more than disrespectful, rude, chilly, or otherwise disagreeable behavior. *See Samoza v. Univ. of Denver*, 513 F.3d 1206, 1217-18 (10th Cir. 2008).

A plaintiff must show that supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions. *See Gunnell*, 152 F.3d at 1265. Plaintiff argues she was forced to remain working in the same area as Lesko in retaliation for her complaint. Based on the record construed favorably to Plaintiff, no jury could conclude that permitting Lesko to return to the surgical unit after a nearly three-month forced leave of absence and under conditions to avoid interactions between Lesko and Lopez constituted a hostile work environment created by Plaintiff's supervisors. Instead, the record reveals Defendant repeatedly investigated and imposed progressive discipline against Lesko for each formal complaint Plaintiff made against him. The record does not show that Defendant condoned the behavior of Lesko about which Plaintiff complained. Plaintiff has not met her burden of producing evidence to demonstrate an adverse action necessary to establish a prima facie case of retaliation.

Even if Plaintiff has made such a showing, Defendant has shown a legitimate non-discriminatory reason for why Defendant moved Lesko from the ENT unit to Unit 2B where his equipment was located and for why Defendant temporarily transferred Plaintiff to optometry based on her own request. Plaintiff argues that Defendant's reason is pretext, arguing it is implausible that Defendant desired to protect Plaintiff when the VA moved Lesko back to Unit 2B in the first place, knowing her concern for her safety, and when the VA transferred Plaintiff back from optometry into Unit 2B. Plaintiff, however, presented no evidence to rebut Defendant's assertion that Plaintiff did not have the necessary qualifications to remain in optometry. Moreover, as discussed *supra*, the record establishes that after each complaint by Plaintiff, Defendant conducted a prompt investigation, imposed progressive discipline against Lesko, and permitted his return to Unit 2B under restrictive conditions in which he was not have no contact with Plaintiff. The record also shows Defendant made considerable efforts to prevent Plaintiff from having contact and interactions with Lesko while they worked in the same unit by

floating her and taking steps to ensure they did not work together. For all the foregoing reasons, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Supporting Memorandum (**ECF No. 25**) is **GRANTED** and judgment will be entered in favor of Defendant and against Plaintiff on all claims.

_____
**UNITED STATES DISTRICT JUDGE**